**Slip Op. 04-144**

**United States Court of International Trade**

WITEX, U.S.A., INC., ET AL.,

         Plaintiff,

       v.

UNITED STATES,

         Defendant.

Before: Pogue, Judge

Consol. Court No. 98-00360

[Cross motions for summary judgement denied.]

Decided: November 15, 2004

Aitken Irvin Berlin & Vrooman, LLP (<u>Bruce Aitken</u>, <u>Bruce de Grazia</u>, and <u>Virginie Lecaillon (consultant)</u>) for the Plaintiff.

<u>Neville Peterson LLP</u> (<u>Maria E. Celis</u> and <u>John M. Peterson</u>) for the <u>Amicus Curiae</u> in support of Witex U.S.A, Inc., et al., Congoleum Corporation.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>Barbara S. Williams</u>, Attorney in Charge, International Trade Field Office, <u>Amy M. Rubin</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, <u>Yelena Slepak</u>, Attorney, Office of Assistant Chief Counsel, U.S. Customs and Border Protection, for Defendant.

**OPINION**

**Pogue, Judge**: This case involves the proper meaning of the term "tileboard" as used in subheading 4411.19.30 of the Harmonized Tariff Schedule of the United States (1997) ("HTSUS"). Plaintiffs Witex, U.S.A., Inc. and Mannington Mills ("Witex") challenge the

United States Customs Service's[1] ("Customs" or "Government")
liquidation of its laminated flooring panels ("merchandise" or
"flooring panels"), claiming that the merchandise should be
liquidated as "tileboard" under heading 4411.19.30, HTSUS, and
therefore duty free.[2] The Government avers that Witex's product is
not "tileboard" and therefore should be classified under a basket

---

[1]Effective March 1, 2003, the United States Customs Service
was renamed the United States Bureau of Customs and Border
Protection. See Homeland Security Act of 2002, Pub. L. No. 107-
296 § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308;
Reorganization Plan Modification for the Department of Homeland
Security, H.R. Doc. No. 108-32, at 4 (2003).

[2]4411          Fiberboard of wood or other ligneous
               materials, whether or not bonded with resins
               or other organic substances:
                    Fiberboard of a density
                    exceeding 0.8 g/cm$^3$:
4411.11.00               Not mechanically worked
                         or surface covered

            *          *          *

4411.19                        Other:
4411.19.20                     Not surface covered (except
                               for oil treatment)

            *          *          *

                               Other:
4411.19.30                          Tileboard which has been
                                    continuously worked along
                                    any of its edges and is
                                    dedicated for use in the
                                    construction of walls,
                                    ceilings or other parts
                                    of buildings

4411.19.40                          Other

provision for fiberboard with a density greater than 0.8 g/cm$^3$, and Witex's merchandise should be assessed a duty of 6% <u>ad valorem</u>. <u>See</u> subheading 4411.19.40, HTSUS. Before the Court are cross motions for summary judgment pursuant to USCIT Rule 56. The Court has exclusive jurisdiction over this case. <u>See</u> 28 U.S.C. § 1581(a)(2000). Finding material issues in dispute, the Court denies both motions for summary judgment.


### BACKGROUND

Witex, U.S.A., Inc. is an importer of laminate panels from its parent, Witex GmbH, a German Corporation. Pl.'s Consol. Compl. ("Compli.") at para. 4(a). Mannington Mills, Inc. is a U.S. company which also imports laminate panels from Witex, GmbH. Pl.'s Consol. Compli. at para. 4(b). This case involves a protest by Witex from 1995 covering one entry,[3] and two protests by Mannington Mills from 1996 covering ten entries.[4]

---

[3]This protest covers Entry No. 471-0953408-2. Pl.'s Compli. at para. 1(a); Pl.'s Mem. Opp'n Def.'s Cross-Mot. Summ. J. ("Pl.'s Resp.") at 2; <u>see also</u> Def.'s Reply Pl.'s Resp. Def.'s Cross-Mot. Summ. J. ("Def.'s Reply") at 3 & n.14.

[4]As stated by Witex's Complaint, the Mannington challenges involve (1) Ruling on Protest No. 1001-99-105507 covering Entry Nos. D82-0981523, D82-0981640, D82-0981765, D82-0981788, D82-0981856, and D82-0981985 and (2) Ruling on Protest No. 1001-99-105508 covering Entry Nos. D82-0982266, D82-0982541, D82-0982760, and D82-0982837. Summons Mannington Mills, at 1,3 (Mar. 21, 2000), Summons Witex at 1 (Feb. 13, 1998). Because Witex did not include Entry No. 82-0980133 within its Summons, Summons Witex at 1 (Feb. 13, 1998), this entry is not properly before the Court, Pl.'s Answers Ct.'s Questions Pursuant Order Dated Sept. 20, 2004

Despite the requirements of USCIT Rule 56, the parties have agreed to few relevant facts. The panels at issue consist of a fiberboard core with a density 0.891 g/cm$^3$, Mem. from Nick Zerebecki, Mannington Mills, to Hao Chen, Mannington Mills, Witex Laminate Products, Ex. 2 to Pl.'s Mem (February 14, 1997) ("Mannington Mem."), Def.'s Statement Additional Material Facts ("Def.'s Statement") at para. 3, and are tongue-and-grooved along their edges and ends.[5] Def.'s Resp. Pl.'s Statement Material Facts at para 1. The tops of the panels are coated with melamine and aluminum oxide, Mannington Mem. at 1, Def.'s Statement at para. 3,

_____

at 1.

[5]The Court notes the Government's objection as to whether Witex has sufficiently proved the identity of its merchandise, i.e., to which type of panels, or from what collection, the contested merchandise belonged. Def.'s Reply at 4 n.18. The cases the Government cites, Group Italglass, U.S.A., Inc. v. United States, 16 CIT 763, 765, 798 F. Supp. 727, 728 (1992) and Fabil Mfg. Corp. v. United States, 25 CIT 514, 517 (2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)), do establish that the burden of proof is on the plaintiff in establishing the identity of the actual imports. However, because "tileboard" remains defined at this stage only in the most general terms, see infra at 20-34, i.e., "tileboard" includes any product of a density greater than 0.8 g/cm$^3$ used on walls, ceilings, or other parts of buildings, and both parties agree to the facts at this level of generality, summary judgment on the basis of Witex's failure to meet its burden is premature at this time. The Court does note that once a definition is established, Witex will bear the burden of proof concerning the identity of its merchandise. For example, if it is established that "tileboard" must look like ceramic tile, and if Witex does not know which entries, if any, have this pattern, Witex will fail to meet its burden of proof.

and the panels may be used on floors.[6] Pl.'s Mem. at 7 para. 19,

Def.'s Statement at para. 1.


**SUMMARY OF ARGUMENTS**

Witex argues that its flooring panels are not fiberboard

products and therefore cannot be classified under heading 4411,

HTSUS.  More specifically, Witex argues that fiberboard, by

definition, is limited to unfinished products, whereas its

merchandise is finished.  Pl.'s Mem. at 11-14, Pl.'s Resp. at 4,

Pl.'s Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply") at 4.

Alternatively, Witex asks the Court to consider the arguments made

in a companion case, Faus Group, Inc. v. United States, slip op. 04-

143 (CIT Nov. 15, 2004), that the flooring panels are properly

classified under heading 4418, HTSUS, covering "[b]uilders' joinery

and carpentry of wood."  Pl.'s Mem. at 25, Pl.'s Resp. at 19-20,

Pl.'s Reply at 14-15.[7]

---

[6]By using the term "use", the Court is not implying that
this is the only, or principle, use of the panels.  Rather, the
Court is merely recognizing that both parties agree that the
panels are used on floors.

[7]The Government asks the Court not to consider this issue
because Witex did not specifically brief it in this case.  Def.'s
Reply at 12, Def.'s Resps. Ct.'s Questions Prior Oral Argument on
the Parties' Cross-Mot. for Summ. J. at 9.  As the Government
maintains: "Taken literally, a mandate to 'find the correct
result' would require a court to conduct its own analysis of
imported merchandise and scour the tariff statute to ensure that
all possible provisions have been considered.  Indeed, this
appears to be precisely what Witex is suggesting."  Def.'s Reply
at 12.  Despite this, the Government also asks the Court to find
that Boen Hardwood Flooring, Inc. v. United States, 357 F.3d 1262

If the merchandise is properly classified in heading 4411, HTSUS, Witex claims that it should be classified under subheading 4411.19.30, HTSUS, which covers "[t]ileboard which has been continuously worked along any of its edges and is dedicated for use in the construction of walls, ceilings or other parts of buildings." Pl.'s Mem. at 14-24, Pl.'s Resp. at 6-18, Pl.'s Reply at 1-13. Witex maintains that Customs unduly restricted the scope of subheading 4411.19.30, HTSUS, by requiring that the panels be used on walls. Pl.'s Mem. at 16, Pl.'s Resp. at 7, Pl.'s Reply at 2-3.

The Government argues that the merchandise is classifiable under heading 4411, HTSUS. The Government asserts that Witex relies on a commercial definition of fiberboard used in Europe to support its contention that fiberboard can only be unfinished. Def.'s Mem. at 25-26. That European commercial definition, the Government contends, is irrelevant to the classification of products under the HTSUS. Id. In defining "tileboard," the Government points to the legislative history of the "tileboard" provision which includes a letter from J.J. Barker Co. to the Trade Policy Staff Committee seeking a provision for its imports. Def.'s Mem. at 11-13, 18, 20, Def.'s Reply at 8. According to the Government, J.J. Barker Co. had

---

(Fed. Cir. 2004) controls this case insofar as it concerns the potential classification of the merchandise under heading 4418, HTSUS. See, e.g., Def.'s Mem. Supp. Cross-Motion Summ. J. ("Def.'s Mem.") at 29. However, Boen Hardwood Flooring did not decide this issue, and heading 4418, HTSUS, was never argued by the parties, at least at the trial court level. The Government cannot have it both ways.

been importing its "tileboard" product duty free under the Tariff Schedule of the United States ("TSUS"), but was facing a 6% ad valorem duty with the transition to the HTSUS. Def.'s Mem. at 11-13; see also subheading 4411.19.40, HTSUS. Therefore, in order to ensure that J.J. Barker's "tileboard" imports did not face an increase in duty, the "tileboard" provision was added. Id. As the Government argues, because Witex's merchandise is not similar to J.J. Barker's "tileboard," Witex's merchandise cannot be considered "tileboard" within the meaning of subheading 4411.19.30, HTSUS. Id. The Government further argues that based on a dictionary definition of "tileboard," Def.'s Mem. at 16, 18, evidence from industry practice, Def.'s Mem. 17, 22, Def.'s Reply at 8-9, and the Government's expert witness, Def.'s Mem. at 21, Witex's panels are not "tileboard" because "tileboard: (i) is not laminated, (ii) is usually embossed with a pattern, and (iii) is coated with an epoxy or other [liquid] finish to resemble ceramic tile," Def.'s Mem. at 20-21 (brackets around "liquid" in original), (iv) is water-resistant, Def.'s Mem. at 17, 19-20, and (v) is only used on walls, Def.'s Mem. at 21. Accordingly, the Government claims that because Witex's merchandise is laminated, is not embossed, does not look like ceramic tile, Def.'s Mem. at 20, is not water-resistant, Def.'s Mem. at 19-20, and is used as flooring, not wallboard, Def.'s Mem. 14 n.14, 22, it cannot be "tileboard." Therefore, the Government argues, Witex's product is excluded from subheading 4411.19.30, HTSUS, rendering it classifiable under 4411.19.40, HTSUS, covering

"[o]ther" forms of fiberboard with a density of greater than 0.8

g/cm$^3$ which are surfaced coated by more than oil.

## STANDARD OF REVIEW

"The proper scope and meaning of a tariff classification term

is a question of law . . . while determining whether the goods at

issue fall within a particular tariff term as properly construed is

a question of fact." Franklin v. United States, 289 F.3d 753, 757

(Fed. Cir. 2002) (citations omitted).  A Customs' classification

ruling is subject to de novo review[8] as to the meaning of the tariff

provision, pursuant to 28 U.S.C. § 2640, but may be accorded a

"respect proportional to its 'power to persuade.'"  United States

v. Mead, 533 U.S. 218, 235 (2001) (quoting Skidmore v. Swift & Co.,

323 U.S. 134, 140 (1944)).

Both parties have moved for summary judgment pursuant to USCIT

Rule 56.  Summary judgment is only appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled

---

[8]Witex occasionally appears to suggest that Customs Rulings
are reviewed under an abuse of discretion standard. See, e.g.,
Pl.'s Resp. at 9-10, Pl.'s Reply at 4-5.  In classification
cases, Witex must show that its product is "tileboard" under some
definition of "tileboard."  Even if the Government's definition
is wrong, that does not by itself make a product "tileboard," nor
does it resolve the case, for then the Court must define the term
"tileboard." See Jarvis Clark Co. v. United States, 733 F.2d 873,
878 (Fed. Cir. 1984).

to judgment as a matter of law." USCIT R. 56(c)(emphasis added).

Material issues only arise concerning "facts that might affect the

outcome of the suit under the governing law." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986). Consequently, in

classification cases, genuine issues of material fact only arise

when there is a dispute over the use, characteristics, or properties

of the merchandise being classified, Brother Int'l Corp. v. United

States, 26 CIT ___, ___, 248 F. Supp. 2d 1224, 1226 (2002), or where

commercial meaning is in question. Russell Stadelman & Co. v.

United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001). For the

reasons set forth below, summary judgment for either party at this

point is not warranted.


### DISCUSSION

"The proper classification of merchandise entering the United

States is directed by the General Rules of Interpretation ('GRIs')

of the HTSUS and the Additional United States Rules of

Interpretation." Orlando Food Corp. v. United States, 140 F.3d

1437, 1439 (Fed. Cir. 1998). The HTSUS is organized by headings

setting forth general categories of merchandise; below each heading

are listed subheadings (and then further subdivisions) that more

specifically describe products within each heading. Id. According

to the GRIs, a Court must choose the most appropriate heading, and

then, "[o]nly after determining that a product is classifiable under

the heading should the court look to the subheadings to find the

correct classification for the merchandise."  Id. at 1440 (citing GRI 1, 6, HTSUS).  Once the Court chooses the proper heading, the Court is limited to choosing a subheading only from within the proper heading, i.e., the subheadings appearing under other headings become irrelevant for the classification of the merchandise at issue.  Id.

Because there is a dispute as to the proper heading, the Court will first determine whether the flooring panels are properly classified under heading 4411, HTSUS.  After finding that the merchandise is properly classifiable under heading 4411, HTSUS, the Court will construe subheading 4411.19.30, HTSUS, ultimately concluding that material issues remain to be resolved.

### I. Choosing the Proper Heading

### A. Meaning of Fiberboard

As required by GRI 1, HTSUS, "classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ."  Heading 4411, HTSUS, covers "[f]iberboard of wood or other ligneous materials, whether or not bonded with resins or other organic substances."  Both parties concede that the merchandise is made with a fiberboard core.  Pl.'s Statement Undisputed Facts Supp. Pl.'s Mot. Summ. J. at para. 2, Def.'s Statement at para. 1.  Fiberboard is defined as "[a] general term that refers to any of various panel products such as particleboard, hardboard, chipboard, or other type formed by bonding

wood fibers by heat and pressure."  Terms of the Trade 130 (4th ed.

2000); see also Webster's II New Riverside University Dictionary 474

(1988) ("[a] building material made of plant fibers, as wood, bonded

together and compressed into rigid sheets.").  These definitions do

not define "fiberboard" by any element of its finish.

Witex contends that Customs wrongfully classified its

merchandise under heading 4411, HTSUS, because fiberboard includes

only unfinished merchandise whereas Witex's merchandise is finished.

To support is contention, Witex introduces a letter from the

European Producers of Laminate Flooring ("EPLF") stating that

"[f]rom an industry perspective . . . [l]aminate panelling, which

is widely used in the industry for both wall and floor applications,

cannot be fibreboard because, by definition, fibreboard is a

component of some types of laminate and, at most, can be considered

unfinished laminate."  Letter from Peter H. Meyer, Managing Director

of the European Producers of Laminate Flooring, to Bruce Aitken,

Esq., Ex. 12 to Pl.'s Mem. at 12 (Feb. 28, 2002) ("EPLF Letter").[9]

Witex also cites the Deposition of Paul Garetto, a National Import

Specialist, as saying: "If you asked for fiberboard, if you go to

a lumberyard, probably they would direct you to a 4 by 8 sheet of

fiberboard, probably unfinished."  Dep. Paul Garetto, Ex. 14 to

---

[9]The Court does not know what is meant by "unfinished laminate," i.e., whether "unfinished laminate" means that fiberboard must undergo further operations to become a finished laminate flooring panel, or whether it means that the fiberboard has not been surface coated with a finish.  However, this ambiguity is immaterial for the reasons set forth below.

Pl.'s Mem. at 118 (Jan. 15. 2004).[10]  According to Witex's logic, because "fiberboard" is by definition unfinished, and because Witex's product is finished, the merchandise cannot be "fiberboard." Pl.'s Mem. at 12-14.  Essentially, what Witex's argument boils down to is that there is a commercial meaning of "fiberboard" which precludes the classification of its merchandise under heading 4411, HTSUS.  Witex's argument is unpersuasive for two reasons: (1) Witex has failed to establish a commercial meaning for the proposition it seeks; and (2) even if Witex were correct as to the meaning of "fiberboard," Witex reads the word "fiberboard" out of context with the rest of the tariff provision.

First, Witex fails to establish a commercial meaning for its merchandise.  Witex is correct in claiming that an established commercial meaning prevails over a common meaning unless contrary to Congressional intent.  See Maddock v. Magone, 152 U.S. 368, 371 (1894) (citing Cadwalader v. Zeh, 151 U.S. 171, 176 (1893)). However, in order to establish a commercial meaning, the party invoking a commercial meaning has the burden of proving that a term has a commercial meaning that is "definite, uniform, and general

---

[10]Witex suggests that Paul Garetto's testimony represents the "common meaning" of "fiberboard."  Pl.'s Mem. at 13-14. Because the determination of common meaning is a question of law, Schott Optical Glass, Inc. v. United States, 67 C.C.P.A. 32, 34, 612 F.2d 1283, 1285 (1979), and the common meaning of a word should be readily obtainable to all persons who do not have specialized knowledge, testimony regarding a common meaning is considered only advisory.  See Toyota Motor Sales, U.S.A., Inc. v. United States, 7 CIT 178, 183-84, 585 F. Supp. 649, 654 (1984).

throughout the trade," <u>Carl Zeiss, Inc. v. United States</u>, 195 F.3d 1375, 1379 (Fed. Cir. 1999), and that this "definite, uniform, and general meaning" is used in the United States' trade and commerce, <u>Two Hundred Chests of Tea v. Smith</u>, 22 U.S. (9 Wheat) 430, 438 (1824) ("Whether a particular article were designated by one name or another, in the country of its origin . . . was of no importance in the view of the legislature."), <u>Wing Coffee Co., Ltd. v. United States</u>, 53 Cust. Ct. 60, 63 (1964). Accordingly, "in considering the commercial designation of a tariff term, <u>only</u> commercial use of that term in the <u>United States</u> is relevant." <u>Russell Stadelman & Co. v. United States</u>, 242 F.3d 1044, 1049 (Fed. Cir. 2001) (emphasis added).

The evidence proffered by Witex fails to meet the burden of proof for establishing a commercial meaning in this case. A letter from a single European trade association, that represents only producers of laminate flooring,[11] does not provide any evidence of a definite, general, and uniform meaning of a term as used in the United States. Nor is Witex's claim supported by the Deposition of Paul Garretto. The Deposition of Paul Garretto merely establishes that if a person asked for fiberboard at a lumberyard, they

---

[11]Witex also cites the European Committee for Standardization's definition of fiberboard: "panel material with a nominal thickness of 1.5 mm or greater, manufactured from lignocellulosic fibers with application of heat and/or pressure." Pl.'s Mem. at 13. If this definition were relevant, it would still not support Witex's contention because it does not impose any requirement that fiberboard be "unfinished."

"probably" would be directed to unfinished fiberboard. This does not constitute evidence that if fiberboard is finished it is no longer fiberboard. Because Witex has failed to adduce any probative evidence for a "definite, uniform, and general" commercial meaning for "fiberboard," the Court is bound by the common meaning of fiberboard as that term appears in heading 4411, HTSUS.[12]

Secondly, Witex's reading of heading 4411, HTSUS, is belied by the language of the heading, chapter notes, and the Explanatory Notes. Heading 4411, HTSUS, is an eo nomine provision as it "describes a commodity by a specific name." Am. Hardboard Ass'n v. United States, 12 CIT 714, 715 (1988); see also JVC Co. of Am. v. United States, 234 F.3d 1348, 1352 (Fed. Cir. 2000). Because eo nomine "provision[s] include[] all forms of the named article unless limited by [their] terms," Am. Hardboard, "[a]n improvement in merchandise provided for eo nomine does not remove it from classification under the eo nomine designation." Arthur J. Humphreys, Inc. v. United States, 973 F.2d 1554, 1556 (1992). Consequently, when an eo nomine provision is used as it is in heading 4411, HTSUS, the tariff term implicitly means fiberboard and products made from fiberboard.[13] Therefore, even if a piece of

_____

[12]Just because the Court rejects the notion that fiberboard has a commercial meaning in the manner suggested by Witex does not mean that other terms under heading 4411, HTSUS, do not have commercial meanings. See infra at 24-32.

[13]Chapter Note 4 to Chapter 44, HTSUS, mandates that there is a point where the product has been sufficiently advanced such that it no longer falls within the eo nomine designation.

fiberboard has been further worked beyond its raw form, it still
remains classifiable under heading 4411, HTSUS.

The drafters of the HTSUS, and Congress, recognized that
heading 4411, HTSUS, includes fiberboard products that have been
further worked through the inclusion of Chapter Note 4 to Chapter
44 which provides that "[p]roducts of heading 4410, 4411, or 4412
may be worked to form the shapes provided for in respect of articles
of heading 4409, curved, corrugated, perforated, cut or formed to
shapes other than square or rectangular or submitted to any other
operation provided it does not give them the character of articles
of other headings." Chapter Note 4 to Chapter 44, HTSUS.[14]  Chapter
Note 4 admits that fiberboard products transformed beyond their raw
character are nonetheless still classifiable under heading 4411,
HTSUS, unless subjected to an operation, not among those enumerated,
that gives the product the character of an article in another
heading.  The Explanatory Note to 44.11 further specifies that
"[i]mpregnating or other agents may also be added during or after

_____

However, the Court rejected in Faus Group, Inc. v. United States,
slip op. 04-143 (CIT Nov. 15, 2004) the argument that surface
covering and tongue-and-grooving fiberboard were sufficient to
remove a product from heading 4411, HTSUS.
    This reading is also consistent with the North American
Laminate Flooring Association's definition of fiberboard which
recognizes that "fiberboard" is a "core material."  See North
American Laminate Flooring Association, Laminate Flooring, Ex. 6
to Pl.'s Mem. at 2.

    [14]For a thorough discussion of Note 4 to Chapter 44, see
Faus Group, Inc. v. United States, slip op. 04-143 (CIT Nov. 15,
2004).

manufacture of the board to give an extra property, e.g., impermeability to water or resistance to rot, insect attack, fire or the spread of flame." Harmonized Commodity Description and Coding System, Explanatory Note 44.11 (2nd ed. 1996) at 680 ("Explanatory Notes" or "EN"); cf. Chapter 44, U.S. Note 1(c), HTSUS. Last, the subheadings under heading 4411, HTSUS, include products such as "tileboard," subheading 4411.19.30, HTSUS, and "[l]aminated boards bonded in whole or in part, or impregnated, with synthetic resins," subheading 4411.29.20, HTSUS. Witex's reading of heading 4411, HTSUS, to preclude classification of its laminated paneling therein, would render nugatory the above referenced provisions, in violation of the well-established rule of statutory construction that all parts of a statute should be given effect if possible. See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633 (1973). Therefore, the text and Explanatory Notes demonstrate a clear Congressional intent not to use the restrictive definition of "fiberboard" advanced by Witex. Accordingly, even if Witex could prove its commercial meaning of "fiberboard," there is a clear indication that Congress did not intend Witex's claimed commercial meaning. See Cadwalader v. Zeh, 151 U.S. 171, 176 (1894) (the "commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention.").


**B. Other possible headings**

Alternatively, Witex asks the Court to choose another appropriate heading, referencing the dispute before the Court in Faus Group, Inc. v. United States, slip op. 04-143 (CIT Nov. 15, 2004), which deals with heading 4418, HTSUS, covering "[b]uilders' joinery and carpentry of wood." Pl.'s Mem. at 25.  In Faus Group, slip op. 04-143 (CIT Nov. 15, 2004), the Court found that nearly identical laminated flooring panels were properly classifiable under heading 4411, HTSUS, and not under heading 4418, HTSUS.  Because Witex does not present any arguments or evidence that would distinguish its merchandise from the merchandise in Faus Group, the Court deems that Witex's flooring panels are likewise classifiable under heading 4411, HTSUS, for the reasons set forth in Faus Group.

**C. Heading 4411, HTSUS, is the proper heading**

Because Witex's merchandise is classifiable under heading 4411, HTSUS, and there are no other appropriate headings under which its merchandise would fall, heading 4411, HTSUS, is the proper heading for Witex's flooring panels.

## II.  Choosing the Proper Subheading

Finding that Witex's flooring panels are properly classified under heading 4411, HTSUS, the Court next addresses under which subheading the merchandise falls.  Both parties agree that, if the merchandise falls under heading 4411, HTSUS, the merchandise either

falls under subheading 4411.19.30, HTSUS, for "[t]ileboard which has been continuously worked along any of its edges and is dedicated for use in the construction of walls, ceilings, or other parts of building," or subheading 4411.19.40, covering all "other" fiberboard products with densities greater than 0.8 g/cm$^3$ which are surface covered by more than an oil treatment.[15] Because subheading 4411.19.40, HTSUS, is a basket provision, i.e., covering all products not classifiable elsewhere,[16] the flooring panels are only classifiable in subheading 4411.19.40, HTSUS, if they are not classifiable under subheading 4411.19.30, HTSUS. See Rollerblade,

---

[15]There are three categories of subheadings under heading 4411, HTSUS, differentiating products on the basis of the density of the fiberboard product: (1) subheadings 4411.11 - 4411.19, HTSUS, covering fiberboard products with densities of greater than 0.8 g/cm$^3$; (2) subheadings 4411.21 - 4411.29, HTSUS, covering fiberboard products with densities exceeding 0.5 g/cm$^3$ but not exceeding 0.8 g/cm$^3$ and; (3) subheadings 4411.31 - 4411.99, HTSUS, covering fiberboard with density of less than 0.5 g/cm$^3$. Because Witex's flooring panels have a density of greater than 0.8 g/cm$^3$, they fall within the first category of goods. This category is further divided as to whether the merchandise has been "mechanically worked or surface covered" where surface covered "means that one or more exterior surfaces of a product have been . . . overlaid with paper . . . ." Chapter 44, U.S. Note 1(c), HTSUS. Witex's flooring panels are overlaid with a color photograph of wood and are therefore "surface covered." This subdivision is further subdivided for products that have not been "surface covered (except for oil treatment)" which does not include Witex's merchandise because of the paper overlay.

[16]Witex appears confused by what is meant by a "basket provision." See Pl.'s Mem. at 11. Classifying a product in a "basket provision" does not mean that a product is "unfinished." A "basket provision" is simply used to classify products not classifiable elsewhere. In fact, to be classified under subheading 4411.19.40, HTSUS, a product must be mechanically worked and surface coated by more than just oil which makes products classifiable there far from "unfinished."

Inc. v. United States, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (citing

EM Indus., Inc. v. United States, 22 CIT 156, 165, 999 F. Supp.

1473, 1480 (1998)).  Consequently, this case hinges on the meaning

of subheading 4411.19.30, HTSUS.

Subheading 4411.19.30, HTSUS, covers "[t]ileboard which has

been continuously worked along any of its edges and is dedicated for

use in the construction of walls, ceilings, or other parts of

buildings."  Subheading 4411.19.30, HTSUS.   The language of the

subheading requires a product to exhibit three features: (1) it must

be "tileboard"; (2) which has been continuously worked along any of

its edges; and (3) is dedicated for use in the construction of

walls, ceilings or other parts of buildings. Both parties

essentially agree that Witex's flooring panels satisfy the last two

prongs of the test: the panels are tongue-and-grooved along their

edges, satisfying the second prong; moreover, the panels are used

on "floors" which may be included within the meaning of "other parts

of buildings."[17]  However, the parties do not agree on the meaning

_____

[17]The Court agrees that "other parts of buildings" may
include floors.  However, because "other parts of buildings" may
include floors, it does not necessarily follow that "other parts
of buildings" must include floors. Rather, the "other parts of
buildings" modifies "tileboard."  In other words, this language
means "other parts of buildings" where "tileboard" is used – if
"tileboard" is not used on floors, then floors are not another
part of a building where "tileboard" is used.  Because ejusdem
generis is only applicable where legislative intent is unclear,
see 2A Norman J. Singer, Statutes and Statutory Construction §
47.18 at 287-88 (6th ed. 2000), if the Government can establish
that the clear meaning of "tileboard" requires principle use on
walls, then "other parts of buildings" cannot be read to enlarge
the definition of "tileboard."  As a brief aside, the phrase

of the word "tileboard." Consequently, the Court must define "tileboard" to determine whether the flooring panels can be classified under subheading 4411.19.30, HTSUS.

## A. The Legislative History

"The first step in properly construing a tariff classification term is to determine whether Congress clearly defined that term in either the HTSUS or its legislative history." Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001) (emphasis added). "Tileboard" is not defined in the HTSUS; however, both the Customs' Ruling, Headquarters Ruling ("HQ") 960084 ((December 10, 1997), and the Government in this case have suggested that "tileboard" is defined by the legislative history of subheading 4411.19.30, HTSUS.

In 1989, as part of an international effort to adopt a common nomenclature across nations, see Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n.1 (Fed. Cir. 1999), the United States agreed to adopt the headings and subheadings (up to the six digit level) established under the international Harmonized Schedule, but reserved the right to create further subdivisions beyond the six

---

"wall, ceilings and other parts of buildings" was employed by the TSUS in defining "building boards." See Headnote 1(e) of Part 3 of Schedule 2 TSUS (1987). Neither of the two cases evaluating this term, Am. Hardboard Ass'n v. United States, 12 CIT 714 (1988), F.W. Myers & Co., Inc. v. United States, 59 Cust. Ct. 427, 275 F. Supp. 811 (1967), appear to lend assistance to the inquiry here.

digit level, see International Convention on the Harmonized Commodity Description and Coding System Article 3(3) found at http://www.wcoomd.org/ie/En/Conventions/conventions.html.[18] Before the transition to the HTSUS became fully effective, J.J. Barker, Co. ("J.J. Barker"), an importer of "tileboard," alerted the Trade Policy Staff Committee ("TPSC")[19] that although its imports of paneling were duty free under the TSUS, under the proposed HTSUS J.J. Barker's product would face a 6% ad valorem duty rate. See Letter from S.C. Gauthier to Christopher P. Marcich, Director of Tariff Affairs, Ex. D to Def.'s Mem. (Jan. 8, 1988) ("Barker Letter"). According to the Government, the TPSC responded by adding subheading 4411.19.30, HTSUS, in order to maintain duty free treatment for J.J. Barker's imports. Def.'s Mem. at 11-14. According to the Government, because J.J. Barker's product was referred to as "tileboard," the Court should look to that product as a model for what constitutes "tileboard" within the meaning of

---

[18]The "tileboard" classification is beyond the six-digit level, and each nation is allowed to create its own subdivisions beyond the six-digit level. How Europe classifies these goods is therefore irrelevant when considering how the United States should classify goods at this level unless a party can show that the creation of the U.S. provision was influenced by the European nomenclature.

[19]The TPSC was responsible for converting the TSUS to the HTSUS. The TPSC solicited public comment for the express purpose of "[a]void[ing], to the extent practicable and consonant with sound nomenclature principles, changes in rates of duty on individual products." Public Hearings on the Harmonized Commodity Description and Coding System, 48 Fed. Reg. 34,822, 34,823 (USTR Aug. 1, 1982).

subheading 4411.19.30, HTSUS.  See Def.'s Mem. at 12-13.  The

Government, gleaning its information from a product brochure, Easy

Living – With Barker, Ex. E to Def.'s Mem., describes "tileboard"

as "completely water resistant decorative wall panels made of non-

laminated hardboard with a density of 1.15 $g/cm^3$ with their surface

painted, coated and grooved to imitate individual ceramic tiles."

Def.'s Mem. at 12.

The letter from J.J. Barker cited by the Government, however,

is of dubious probative value and does not provide a definite or

express definition of "tileboard."  As the Supreme Court has noted:

> Legislative history is problematic even when the attempt
> is to draw inferences from the intent of duly appointed
> committees of the Congress.  It becomes far more so when
> we consult sources still more steps removed from the full
> Congress and speculate upon the significance of the fact
> that a certain interest group sponsored or opposed
> particular legislation. We ought not attribute to
> Congress an official purpose based on the motives of a
> particular group that lobbied for or against a certain
> proposal – even assuming the precise intent of the group
> can be determined . . . .

Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 120 (2001)

(citations omitted).  Similarly, the court in United States v.

Paramount Publix Corp., 22 C.C.P.A. 452, 460 (1934) found that

committee testimony of interested parties was not "controlling since

the enactment of the provision in the language before us might have

been with an intent wholly different from that indicated by the

witnesses."  This problem is particularly acute here where there is

no indication of how the TPSC, or Congress, defined "tileboard" in

relation to J.J. Barker's product.[20]  Therefore, this history does

not provide the Court with a definite or express definition of

"tileboard."[21]

_____

[20]In its letter to the TPSC, J.J. Barker only described its
product as "finished hardboard" of "high quality, high priced
'tileboard' bath and kitchen panels."  Barker Letter, Ex. D to
Def.'s Mem. at 1. (Note that: (a) the letter describes the
merchandise not just as "tileboard," but a certain type of
"tileboard" – i.e., "high quality, high priced 'tileboard'" and
(b) J.J. Barker also felt it was necessary to mention that its
product was used in the bath and kitchen, an unnecessary defining
feature if the only use of "tileboard" was in the bath and
kitchen.)  J.J. Barker appended a classification ruling from 1971
that described the product as "hardboard wall panels which are
coated with melamine" which were bull-nosed, or rounded, along
their vertical edges.  Id. at 4; cf. with the Government's
description, Def.'s Mem. at 12 (J.J. Barker's product was
"completely water resistant decorative wall panels made of non-
laminated hardboard with a density of 1.15 g/cm$^3$ with their
surface painted, coated and grooved to imitate individual ceramic
tiles.").  It is not clear upon which, if any, of these
descriptions, the TPSC based its definition of "tileboard."
Moreover, even if the Court were to adopt any of these
descriptions, it would be impossible to determine what are the
essential characteristics of "tileboard" on the basis of one
product.  For example, if a product matched the Government's
proffered description, but it was only 1.1 g/cm$^3$ in density, or
if the product imitated marble rather than ceramic tiles, would
it still be "tileboard"?  Nonetheless, this evidence is not
completely valueless.  For instance, if Customs sought to
classify products in a way that would exclude J.J. Barker's
product from subheading 4411.19.30, HTSUS, this evidence may be
probative.

[21]When the legislative history provides a clear or express
definition of a tariff term, the Court will rely on that
definition.  For example, courts have used definitions in reports
prepared in conjunction with the drafting of the tariff
provision, see e.g., Arthur J. Humphreys, Inc. v. United States,
973 F.2d 1554, 1557 (Fed. Cir. 1992), or judicially established
definitions of the same term used in an earlier version of the
tariff schedule, see e.g., Intercontinental Marble Corp. v.
United States, 381 F.3d 1169, 1175-76 (Fed. Cir. 2004) (using the
commercial definition of marble as established under the TSUS
when interpreting that term in the HTSUS).  However, absent a

Consequently, because the legislative history is of a non-dispositive nature, this case cannot be resolved by looking first to the legislative history for a definition. This does not mean that the Court deems the legislative history irrelevant for future use to bolster a definition; it simply means that at this juncture, the instant case cannot be resolved by recourse to the legislative history.

## B. Commercial Meaning

When the HTSUS or legislative history do not define a term, the Court looks to the term's common or commercial meaning. Both parties have suggested that there is a commercial meaning for the term "tileboard."[22] Because a commercial designation, once proven,

---

clear or express definition provided by the legislative history, definitions gleaned from the legislative history are merely probative and are used to bolster or support a definition derived from dictionaries, lexicons, scientific authorities, and other such reliable sources. Cf., Anhydrides & Chems., Inc. v. United States, 130 F.3d 1481 (Fed. Cir. 1997).

[22]The Court has been able to locate certain dictionary definitions of "tileboard." See Webster's Third New International Dictionary 2393 (1986) ("1: a board used in interior finishing and made from a large sheet of any of various materials having a decorative coating simulating a tiled surface. 2: a thin large square piece (as of wood) often with beveled edges that is fitted together with other like pieces to cover ceilings or walls."); McGraw-Hill Dictionary of Scientific and Technical Terms 2151 (6th ed. 2003) ("[a] type of wallboard used for interior finishing in which the outer surface is a layer of hard glossy material, usually simulating tile."); Terms of the Trade 342 (4th ed. 2000) ("[a] hardboard panel that has been embossed with a pattern and then coated with epoxy. The resulting product is designed to look like ceramic tile, for use in kitchens, bathrooms, etc."); Dictionary of Architecture and

takes precedence over a common meaning, see Boen Hardwood Flooring, Inc. v. United States, 357 F.3d 1262, 1265 (Fed. Cir. 2004), it is appropriate to determine if either party has established, or can establish, a commercial meaning. Cf. Cadwalader v. Zeh, 151 U.S. 171, 176 (1893) ("it is only when no commercial meaning is called for or proved, that the common meaning of the words is to be adopted"). Proof of a commercial meaning is a matter of fact, not law. Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001); but cf. Boen, 357 F.3d at 1265.

As this Court has long maintained, the rule of commercial designation is "intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted." Jas. Akeroyd & Co. v. United States, 15 Ct. Cust. App. 440, 443 (1928). Accordingly, to establish a commercial meaning, a party must prove that "tileboard" has a commercial meaning in the trade "which is general (extending over the entire country), definite (certain of

Construction 939 (3rd ed. 2000)("1. A wallboard used for interior finishing; usually a base sheet material overlaid with a hard, glossy decorative facing to simulate tile. 2. Square or rectangular boards, usually made of compressed wood or vegetable fibers, often with beveled interlocking edges, used for ceiling or wall covering."); Reed Construction Data at http://www.rsmeans.com/dictionary/index.asp?s=tileboard)("(1) A wallboard with a factory-applied facing which is hard, glossy, and decorated to simulate tile. (2) A square or rectangular board of compressed wood or vegetable fibers, used for ceiling or wall facings.") (access is free upon registration, which is also free).

understanding), and uniform (the same everywhere in the country)."
_Rohm & Haas Co. v. United States_, 5 CIT 218, 226, 568 F. Supp. 751,
757 (1983) (citations omitted).  "The commercial meaning of tariff
terms must be proved by persons engaged in buying and selling the
merchandise at wholesale in the United States, or by persons who
know, by their own experience or of their own knowledge, the meaning
of the designation applied to the merchandise by those who buy and
sell it at wholesale."[23]  _Rice Millers' Ass'n, Am. Mfrs. v. United
States_, 15 Ct. Cust. App. 355, 360 (1928).  Moreover, mere negative
inference that a product is excluded from a commercial designation
is insufficient; rather, a party must offer positive evidence of the
actual meaning of the commercial designation.  _United States v. Fung
Chong Co._, 34 C.C.P.A. 40, 44 (1946); _Carl-Zeiss, Inc. v. United
States_, 22 CIT 606, 610-11, 16 F. Supp. 2d 1097, 1101 (1999).  Last,
minus a clear statement of commercial practice, _Boen_, 357 F.3d at
1265, _testimony_ by witnesses is an indispensable tool in
establishing a commercial meaning.  _See, e.g._, _Passaic Worsted Co.
v. United States_, 17 C.C.P.A. 459, 461-62 (1930); _Rice Millers'_, 15
Ct. Cust. App. at 360.  Both parties' evidence fails  to meet these
standards.[24]

---

[23]No evidence has been submitted of this nature.  Testimony
by persons who buy at wholesale, such as buyers for large home
improvement stores, would likely produce greatly illuminating
evidence of commercial meaning.

[24]Witex submits a letter from C. Curtis Peterson
("Peterson"), the Executive Vice President of the American
Hardboard Association ("AHA"), defining "tileboard" in such a way

as to embrace Witex's product.  Letter from C. Curtis Peterson to Witex USA, Inc, Ex. 10 to Pl.'s Mem. at 4-5  (Sept. 3 1997)("Peterson Letter").  However, the Government has argued that this letter is susceptible to two meanings, see Def.'s Mem. at 16, and it appears that Witex never sent a sample of its merchandise for evaluation in garnering this opinion.  Witex also cites a letter from the EPLF.  See, e.g., Pl.'s Mem. at 5. First, for the reasons stated above, the EPLF does not represent United States commercial practice.  See Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1049 (Fed. Cir. 2002).   Second, the EPLF's letter works against Witex rather than for it.  The letter states: "'Tileboard' is considered in the industry to be backing for ceramic tiles."  EPLF Letter, Ex. 12 to Pl.'s Mem. Note, the letter does not say "the simulation of ceramic tiles", rather it says "backing" for ceramic tiles.  There is no indication from either party that Witex's merchandise is used in conjunction with ceramic tiles; even if simulating ceramic tiles were sufficient, "tileboard" would most likely not cover the simulation of wood.

     The Government's evidence fairs no better.  The Court notes the most relevant of the Government's submissions.  (1) The Government alleges that "the Lowes Home Improvement Center in Brooklyn, New York, displays products labeled as 'tileboard,' such as [a physical sample the Government provided the Court], in its 'decorative wall paneling' section while laminated flooring is located in the 'flooring' section." Def.'s Mem. at 22; Def.'s Reply at 9 n.23.  This is not corroborated by affidavit, deposition or other evidentiary material. See USCIT R. 56(e). (2) The Government submits pictures of Louisiana Pacific Graystone Tileboard, i.e., Louisiana Pacific Graystone Tileboard, Ex. B. to Def.'s Mem., without reference to who took them or where the pictures are from, e.g., a webpage URL or product brochure; these pictures cannot be considered as evidence. (3) The Government cites the Study Concerning the Tariff Classification of Imported Laminate Flooring Panels, a report prepared by F. Holbrook Platts ("Platts") of Platts Laminate Technologies which should have been appended to that brief.  Def.'s Mem. at 21.  However, the Government has not provided the Court with a copy of that report, the credentials of Platts, or indicated upon what Platts bases his conclusion.  (4) Of, and to the extent, the Government is attempting to incorporate Voluntary Product Standard 59-73 on "Prefinished Hardboard Paneling," see Def.'s Mem. at 16-17, the Court notes that this Product Standard was withdrawn in 1980. See Status Report on Withdrawal of Voluntary Product Standards, 45 Fed. Reg. 55,250, 55,250-51 (Nat'l Bureau of Standards Aug. 19, 1980), American National Standards Institute, Prefinished Hardboard Paneling (1973) (with the word "withdrawn" stamped on

Ordinarily, upon the failure of a party, or parties, to establish a commercial designation, the Court will find that there is no commercial meaning and turn to the common meaning of the tariff term. However, it appears premature to entirely reject the possibility that "tileboard" does have a commercial meaning in this case. Rather, what "evidence" has been offered as to commercial meaning has not been sufficiently developed to determine if there is a commercial meaning, and if there is, what exactly that

its cover) (on file with the Court). Moreover, the product standard merely defines products by their finish thereby supporting the Peterson letter (not, necessarily, the Government's position). See American National Standards Institute, Prefinished Hardboard Paneling (1973). (5) The Government's citations to tileboard manufacturers' web sites are not evidence of testimony by wholesalers. See e.g., Def.'s Mem. at 17-18, 22. (6) The Government refers to the National Emissions Standards for Hazardous Air Pollutants for the Surface Coating Operations of Wood Building Products prepared by the Environmental Protection Agency ("EPA"). Def.'s Mem. at 22. If the Government submitted evidence that these regulations were promulgated on the basis of industry standards this evidence might be probative; however, the Government has failed to do so, rendering this evidence of low probative value. Cf. RSMC Inc. v. United States, 84 Cust. Ct. 96, 100 (1980). Moreover, without more information, the Court cannot ascertain whether the surface coating criteria used by the EPA is supportive of, or contradictory to, the American Hardboard Association's definition of surface coating discussed infra at notes 25 and 26. (7) The Government notes that Witex has never marketed its product as "tileboard." See, e.g., Def.'s Resp. Ct.'s Questions Prior Oral Arguments Parties' Cross-Motions Summ. J. at 5. Although evidence of marketing practice may be suggestive, it is not dispositive. See Rainin Instrument Co. v. United States, 27 CIT _ _, ____, 288 F. Supp. 2d 1360, 1366 (2003); cf. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1380 (Fed. Cir. 1999). Moreover, this does not provide the reason for exclusion, i.e., to which part of the Government's proposed five prong test this evidence lends credence.

commercial meaning is.

First, both parties agree that the American Hardboard Association ("AHA") does have a commercial designation for "tileboard." In fact, at least two Customs Rulings have relied, at least in part, on the AHA's commercial definition(s) of "tileboard." HQ 960084 at 4; HQ 085913 at 2 (January 8, 1990). However, neither party has offered testimonial evidence to this effect, and what evidence they have produced is confusing.[25] Because the sources cited by the parties do suggest that the AHA does have a commercial

_____

[25]Custom's initial Headquarters Ruling interpreting subheading 4411.19.30, HTSUS, relied on a commercial designation provided by the AHA. HQ 085913 at 2 (January 8, 1990) (citing the AHA's definition of "tileboard" as: a "hard, durable, and water-resistant coating or finishing applied to fiberboard to give it a ceramic-like or marble-like look."). Likewise, the Ruling in this case supported its conclusion by relying on the opinion of the AHA, albeit with a different definition. HQ 960084 at 4 (noting that tileboard and flooring are separate products). As noted above, Witex has submitted a letter from C. Curtis Peterson ("Peterson"), the Executive Vice President of the AHA, which offers yet another definition of "tileboard." Peterson Letter, Ex. 10 to Pl.'s Mem. at 4 ("Tileboard is a melamine coated high density fiberboard panel product" and "[t]he defining characteristic of tileboard paneling is its 'finish'" which Peterson defines by reference to the American National Standard (ANSI/AHA A135.5-1995) for Class I Finishes.). Fourth, the Government references the AHA Publication entitled "Tileboard Wall Paneling" that "explains that tileboard paneling is suitable for installation in any room in the home including kitchen and laundry, and that it has a hard durable surface that is highly resistant to stains and moisture when properly installed and maintained." Def.'s Mem. at 16-17. The Government did not cite an exhibit number, but the Court found what appears to have been that to which the Government is referring as an Exhibit to the Amicus' Brief. See Ex. A to Brief of Amicus Curiae Congoleum Corp. in Supp. of Pl.'s Motion for Summ. J. ("Brief of the Amicus"). Testimony by a representative of the AHA would help the Court determine if these definitions can be reconciled.

designation, testimony is required to determine to which, if any,

of these definitions the AHA subscribes.[26]

     Second, evidence from industry practice, suggests that the

industry may define "tileboard" differently from common sources.

For example, the Terms of the Trade specifies that "tileboard" is

"[a] hardboard panel that has been embossed with a pattern and then

_____

     [26]Both the Government, and Customs' Ruling, reference the
AHA Publication entitled "Tileboard Wall Paneling" for the
proposition that: "tileboard paneling is suitable for
installation in any room in the home including kitchen and
laundry, and that it has a hard durable surface that is highly
resistant to stains and moisture when properly installed and
maintained." Def.'s Mem. at 16-17; see also HQ 960084. This
publication does include language to this effect, but also notes
that "[h]ardboard tileboard paneling is covered by U.S.
Department of Commerce Voluntary Product Standard PS 59,
'Prefinished Hardboard Paneling,' (ANSI A 135.5-1973) Class 1
Finish," American Hardboard Association, Tileboard Wall Paneling,
Ex. A to Amicus' Brief at 4, which Witex's product may satisfy,
see Aff. of Danny Thomas, Ex. 10 to Pl.'s Mem. at 3 (asserting
that Witex meets the ANSI A 135.5-1995 Standard). The meaning of
this passage is far from unequivocal. If a product meets the
ANSI A135.5-1973 finish specifications (which is presumably an
earlier verison of the ANSI A 135.5-1995 specifications cited by
Witex), does this make the tileboard suitable for application in
bathrooms and kitchens, or are these independent requirements?
The Government's argument is a little difficult to understand
because on the one hand the AHA requires that "tileboard" pass
the ANSI A135.5-1973 Standard, which may include a test for
humidity resistance, cf. Peterson Letter, Ex. 10 to Pl.'s Mem. at
4 (citing the ANSI A 135.5-1995 Standard which includes a test
for "humidity resistance"), while on the other hand, the
Government also alleges that tileboard must have greater
properties for water resistance than those required by ANSI A
135.5-1973. This problem is made especially difficult because:
(a) the Government uses multiple means of referring to water
resistance such as "highly resistant to stains and moisture,"
Def.'s Mem. at 16, or "complete resistance to moisture," id. at
19; (b) frequently discusses water-resistance in terms of where a
product is used, e.g., in bathrooms, Def.'s Mem. at 20; and (c)
has nowhere defined the required level of water resistance
necessary for a product to be considered "tileboard."

coated with epoxy.  The resulting product is designed to look like ceramic tile, for use in kitchens, bathrooms, etc." Def.'s Mem. at 16 (citing <u>Terms of the Trade</u> 280 (3rd ed. 1993)).[27]  Using this definition, the Government deduces that "tileboard" must have an appearance of ceramic tile.  Def.'s Mem. at 20-21.  However, the Government also cites literature from ABT Co., the manufacturer of AquaTile® Embossed Tileboard, claiming that ABT Co.'s Tileboard has "the look of fine tile and marble."  Def.'s Mem. at 17.  Moreover, in HQ 085913, discussing Plywood Panels Inc.'s "tileboard," Customs refers to a definition of "tileboard" provided by the AHA as requiring "tileboard" to have a ceramic tile or marble appearance. HQ 085913 at 1 (January 8, 1990).[28]  Plywood Panels Inc.'s "tileboard" likewise has a "ceramic or marble" appearance.  <u>Id.</u>, Def.'s Mem. at 13 n.13.  Depending on how one defines "designed to look like ceramic tile," ABT Co.'s and Plywood Panels Inc.'s products would not be "tileboard" because of their marble

---

[27]Note that this definition does not require products to be used on walls, and does not necessarily require the product to be water-resistant and to be non-laminated.

[28]Evidence of this definition has not been submitted to the Court.  However, the Court may take judicial notice of the logic and reasoning of Customs Rulings, <u>cf</u>. <u>United States v. Mead</u>, 533 U.S. 218, 235 (2001), especially when the Court is looking to displace a commercial meaning used by Customs with a different common meaning.  The Court also notes that, as addressed in Note 25, this definition is only one variant of the possible AHA definitions, and is the only one that requires a particular appearance.  Therefore, when giving the Government the benefit of the doubt that appearance matters, there is some tension between the commercial and common meaning.

appearance.  In other words, products the Government uses as evidence of "tileboard" would in fact not be "tileboard."  Although the evidence from manufacturers is of questionable probative value, when joined with the purported AHA definition, this evidence leads the Court to believe that there may be a commercial definition of "tileboard" that deviates from the common meaning.

Because the parties have not adequately supported their proffered commercial definitions of "tileboard" despite the fact that a commercial designation seems probable, it is impossible for the Court to exclude the possibility of a commercial designation and arrive at the proper construction of subheading 4411.19.30, HTSUS.[29] However, because of the Court's duty to determine the correct meaning of tariff terms, see Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984), Congress vested the Court of International Trade with broad discretionary powers necessary to resolve cases like this.  See 28 U.S.C. § 2643.  Specifically, 28 U.S.C. § 2643 (b) provides that:

---

[29]Witex is joined by a companion case, Faus Group, slip op. 04-143 (CIT Nov. 15, 2004).  The counsel in that case has rested its resolution on the disposition of this case.  Furthermore, these proceedings are joined by Amicus Congoleum Corporation who has secured an order from the Court suspending its case on the Court's Reserve Calendar pending resolution of this case. Therefore, the interest in developing a cogent and correct theory of subheading 4411.19.30, HTSUS, to apply to future cases (which is not a mere possibility) is strong.  Given that once a commercial or common meaning is established, that meaning remains controlling, see e.g., Intercontinental Marble Corp. v. United States, 381 F.3d 1169, 1176 (Fed. Cir. 2004), it is important that the Court not rush to define "tileboard" with less than complete information as to its meaning.

> If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or <u>adjudicative procedures</u> as the court considers necessary to enable it to reach the correct decision.

28 U.S.C. § 2643 (emphasis added). In addition, USCIT Rule 56(d) authorizes the Court, in this situation, to "direct[] such further proceedings in the action as are just." Therefore, in accordance with its duty to determine the correct meaning of "tileboard," the Court finds that summary judgment is not appropriate at this time and orders the parties to prepare an order governing preparation for trial.


## CONCLUSION

Because the Court finds the record insufficient to establish a commercial designation for the term "tileboard," or exclude the possibility thereof, the cross motions for summary judgment are denied.  The parties shall jointly prepare an order governing preparation for trial and submit it to the Court by December 15, 2004.

It is so ORDERED

                                         /s/ Donald C. Pogue
                                        Donald C. Pogue
                                             Judge


November 15, 2004
New York, New York