**Slip Op. 05-59**

**United States Court of International Trade**

CUMMINS INCORPORATED,[*]

       Plaintiff,

     v.

UNITED STATES,

       Defendant.

Before: Pogue, Judge

Consol. Court No. 01-00073

[Plaintiff's motion for summary judgment denied; Defendant's cross-motion granted.  Judgment entered for Defendant.]

Decided: May 17, 2005

<u>Barnes, Richardson & Colburn</u>, (<u>Lawrence M. Friedman</u>, <u>David G. Forgue</u>) for Plaintiff.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>Barbara S. Williams</u>, Attorney in Charge, International Trade Field Office; <u>Beth C. Brotman</u>, Attorney, Of Counsel, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Bureau of Customs and Border Protection, for Defendant.


**OPINION**

**Pogue, Judge**: This case presents the question of when, in the production of a diesel engine crankshaft ("crankshaft" or "import"), alloy steel becomes a crankshaft for tariff purposes. Plaintiff, Cummins Incorporated ("Cummins" or "Plaintiff"),

_____
*Cummins Engine Company was renamed Cummins Incorporated during the pendency of these proceedings.

challenges a decision of the United States Bureau of Customs and Border Protection ("Customs" or "Defendant").  Cummins asserts that its crankshafts were "semifinished products of other alloy steel" upon importation into Mexico, were transformed into crankshafts in Mexico, and therefore "originated" in Mexico thereby rendering them eligible for duty free treatment under the North American Free Trade Agreement ("NAFTA").  Customs avers that the crankshafts did not "originate" in Mexico and therefore are dutiable at 2.5 percent ad valorem.

Before the Court are cross-motions for summary judgment pursuant to USCIT Rule 56.  Jurisdiction is predicated on 19 U.S.C. § 1515 (2000) and 28 U.S.C. § 1581(a).  The Court concludes that Plaintiff's crankshafts did not originate in Mexico and accordingly grants Defendant's motion for summary judgment.

## I. Background
### A.

Cummins is a manufacturer and importer of crankshafts.  The crankshafts in question started their journey in Brazil where they were forged from alloy steel into the general shape of a crankshaft by Krupp Metalúrgica Campo Limpo ("Krupp").[1]   Pl.'s Mem. Supp.

---

[1]Cummins utilized a closed-die forging process, which involves forging between matrices.  Agreed Stmt. Facts at para. 1 (Dec. 23, 2004 version) ("Agreed Stmt. Facts").  "[A]fter forging," the goods were (i) trimmed, id. at para. 2, and (ii) coined, para. 24-25, as well as (iii) shot blasted, id. id. at

Summ. J. at 7 ("Pl.'s Mem."). Thereafter, Cummins de México, S.A. ("CUMMSA"), Plaintiff's wholly owned subsidiary, imported the products into Mexico where the they were subjected to additional operations.[2]   Id.   Upon importation into Mexico, Mexican authorities classified the crankshafts under heading 8483, Harmonized Tariff Schedule ("HTS"), as crankshafts.  Pl.'s Resp. Ct.'s Questions of April 5, 2005 ("Pl.'s Resp. Ct.'s Quest.") at 9. From Mexico, Cummins imported the goods into the United States. Agreed Stmt. Facts at para. 44; see also id. at paras. 35, 43.  At the time of entry into the United States, as both parties agree, the products were classifiable under subheading 8483.10.30 of the Harmonized Tariff Schedule of the United States ("HTSUS") which covers "[t]ransmission shafts (including camshafts and crankshafts)

_____

para. 28.  Once the goods cooled, they were removed from the dies, and  (iv) the ends were milled (a machining process) to allow them to be securely clamped into machines used for final machining operations performed in Mexico.  Id. At para. 31. Finally, the goods' mass centers (i.e., centers of balance) were established by milling the ends and machining locator center points on each end.  Id. at para. 32.

  [2]In Mexico, the goods underwent at least fourteen different machining operations, touching ninety-five percent of each good's surface.  Agreed Stmt. Facts para. 39.  The goods' mass centers were also reestablished through the same process performed in Brazil.  Id. at para. 37.  These machining processes removed up to one-third of the material from certain areas of the goods and between one-third and two-fifths of an inch of steel from other areas.  See Cummins Engine Co. v. United States, 23 CIT 1019, 1021, 83 F. Supp. 2d 1366, 1368 (1999).

and cranks . . . ."[3]  Id.

Pursuant to the United States' tariff laws, products imported
from Mexico and Canada are eligible for preferential duty treatment
if the goods "originate in the territory of a NAFTA party[.]"
General Note 12(a)(ii), HTSUS; see also 19 U.S.C. § 3332 (2000).
One way a product may originate in the territory of a NAFTA party
is if it is "transformed in the territory" of a NAFTA party.[4]
General Note 12(b)(ii), HTSUS.  As is relevant in this case, one

---

[3]Merchandise classifiable under subheading 8483.10.30,
HTSUS, includes:

| 8483 | Transmission shafts (including camshafts and crankshafts) and cranks; bearing housings, housed bearings and plain shaft bearings; gears and gearing; ball or roller screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches and shaft couplings (including universal joints); parts thereof: |
|---|---|
| 8483.10 | Transmission shafts (including camshafts and crankshafts) and cranks:<br>    Camshafts and crankshafts:<br>   *      *      * |
| 8483.10.30 | Other. |

[4]The HTSUS provides four ways a product may "originate" in
the territory of a NAFTA party.  A product will so originate if
it is: (i) "wholly obtained or produced entirely" in the
territory of a NAFTA party;(ii) "transformed in the territory" of
a NAFTA party; (iii) produced entirely in the territory of a
NAFTA party "exclusively from originating materials;" or (iv)
produced entirely in the territory of a NAFTA party but not with
a nonoriginating material that does not "undergo a change in
tariff classification" for the reasons set forth under General
Note 12(b)(iv), HTSUS.  General Notes 12(b)(i)-(iv), HTSUS.

way the HTSUS defines "transformed in the territory" of a NAFTA party is a "change in tariff classification," General Note 12(b)(ii)(A), HTSUS, "to subheading 8483.10 from any other heading," General Note 12(t)/84.243(A), HTSUS; see also Pl.'s Mem. at 11 n.7. Therefore, as agreed to by both parties, in order for Plaintiff's crankshafts to have originated in Mexico, the crankshafts must not have been classifiable under subheading 8483.10, HTSUS, when they entered Mexico.

Cummins asserts that its crankshafts did undergo this tariff shift in Mexico because its crankshafts were classifiable under heading 7224, HTSUS, upon entry into Mexico. More specifically, Cummins contends that its products, upon entry into Mexico, were "semifinished products of other alloy steel" under heading 7224, HTSUS, because the forgings had not been "further worked" but were only "roughly shaped by forging."

**B.**

The tariff laws of the United States are generally codified in the HTSUS. The HTSUS is predicated on the HTS which was the culmination of an international effort to create a single commodity coding system (tariff classification system) across nations. See Faus Group v. United Sates, 28 CIT ___, ___, 358 F. Supp. 2d 1244, 1247 n.5 (2004). Two of the harmonized system's essential purposes

are to (1) facilitate the computation of trade statistics and (2) establish a standard product descriptor to provide a basis for trade concessions and predictability for international commerce. See GATT, Analytical Index: Guide to GATT Law and Practice 101 (6th ed. 1994). Under the Harmonized Tariff Schedule, products are defined to a certain level of specificity (the six-digit level) at the international level. See U.S. Customs & Border Prot., What Every Member of the Trade Community Should Know About: Tariff Classification 10 (2004). Nonetheless, each nation, including the United States, reserves the right to establish further subdivisions (beyond the six-digit level). Id. at 11.[5] In this case, the competing provisions are both set at the international level.

To resolve interpretative disputes that arise when many nations employ the same tariff schedule and to adapt the Schedule to the ever evolving array of products, the member states to the HTS created the World Customs Organization ("WCO")[6] to issue classification opinions, draft and update explanatory notes, and recommend amendments to the HTS itself. Id. at 9, 26-29. The United States has acceded to all these terms. Under 19 U.S.C. § 3005(a), Congress empowered the International Trade Commission to:

---

[5]It is this degree of additional specificity that makes the HTSUS unique to the United States.

[6]The World Customs Organization was originally named the Customs Cooperation Council but was renamed in 1994. U.S. Customs & Border Prot., What Every Member of the Trade Community Should Know About: Tariff Classification 9 n.1 (2004)

> [K]eep the Harmonized Tariff Schedule under continuous review and periodically, at such time as amendments to the Convention are recommended by the Customs Cooperation Council for adoption, and as other circumstances warrant, shall recommend to the President such modifications in the Harmonized Tariff Schedule as the Commission considers necessary or appropriate –
> > (1) to conform the Harmonized Tariff Schedule with amendments made to the Convention;
> > (2) to promote the uniform application of the Convention and particularly the Annex thereto;
> > (3) to ensure that the Harmonized Tariff Schedule is kept up-to-date in light of changes in technology or in patterns of international trade;
> > (4)to alleviate unnecessary administrative burdens; and
> > (5) to make technical rectifications.

Upon these recommendations, Congress granted the President authority to:

> [P]roclaim modifications . . . to the Harmonized Tariff Schedule if the President determines that the modifications –
> > (1) are in conformity with United States obligations under the convention; and
> > (2) do not run counter to the national economic interest of the United States.

19 U.S.C. § 3006. Lastly, Congress authorized the Treasury Department, Commerce Department, and the International Trade Commission to establish procedures to ensure "that the dispute settlement provisions and other relevant procedures available under the Convention are utilized to promote the United States export interests" and to submit "classification questions to the Harmonized System Committee of the Customs Cooperation Council." 19 U.S.C. § 3010(b)(2)(C). From this brief survey of the statutory landscape it is clear that Congress intended, in large measure, to

harmonize United States tariff classifications with the recommendations of the WCO.

**C.**

This is not the first time the Court has been called upon to address whether Cummins' crankshafts underwent a tariff shift in Mexico. In Cummins Engine Co. v. United States, 23 CIT 1019, 83 F. Supp. 2d 1366 (1999) ("Cummins I"), the Court denied Plaintiff's contention that its crankshafts underwent the requisite tariff shift. Following that opinion, Cummins filed for an amended advanced ruling letter with one variation in the facts stated in Cummins I.[7] Relying, in part, on the Court's decision in Cummins I, Customs maintained that, despite the changes to its manufacturing process, Cummins' crankshafts still did not "originate" in Mexico.

In formulating this analysis, Customs submitted the question to the WCO. See Classification of Certain Forgings for Crank Shafts, Doc. NC0317E1 (Oct. 10, 2000) ("Certain Forgings"). After a formal review, the WCO issued a classification opinion which was approved by the member states 31 to 1. Id., see also Decisions of the Harmonized System Committee, Annex H/9 to Report to the Customs

---

[7]Unlike the imported crankshafts in Cummins I, one of the fourteen operations performed in Mexico on the crankshafts at issues here was machining grease pockets, fifty millimeters in diameter and thirteen millimeters deep, into the flange ends of the goods with a lathe. Agreed Stmt. Facts at para. 42. For the crankshafts considered in Cummins I, the grease pockets were machined in Brazil.

Co-operation Council of the Twenty-Sixth Session of the Harmonized System Committee, Doc. NC0340E2 (Nov. 24, 2000) ("WCO Decision"); Amendments to the Compendium of Classification Opinions Arising from the Classification of Certain Forgings for Crank Shafts in Subheading 8483.10, Doc. NC0379E1 at para. 2 (March 8, 2001). The classification opinion determined that the crankshafts were properly classifiable under heading, 8483, HTS and not heading 7224, HTS. Amendments to the Compendium of Classification Opinions Arising from the Classification of Certain Forgings for Crank Shafts in Subheading 8483.10, Doc. NC0379E1 at para. 2 (March 8, 2001). The WCO also found the text sufficiently clear on this issue and recommended no amendment to text of the HTS.[8] See WCO Decision. Therefore, as this case stands, Mexico's Customs authority (Aduana México),[9] Customs, and the WCO maintain that the

_____

[8]Although the WCO deemed the English version of the HTS to be clear, it recommended amendments to the Explanatory Notes. See WCO Decision; Study of the Possible Misalignment between the French Expressions "Ebauches de Forge" and "Ebauches Brutes de Forge" and the English Expression "Roughly Shaped by Forging" in the Explanatory Notes to Headings 72.07 and 84.83, Doc. NC0394E1 (April 9, 2001).

[9]As both parties correctly point out, in NAFTA cases, the United States reserves the right to reexamine the classification of the products at the time they entered Mexico. See North American Free Trade Agreement, art. 506 §§ 11-13 (1993) (entered into force Jan. 1, 1994) (reprinted in Jackson, et al, 2002 Documents Supplement to Legal Problems of International Economic Relations at 512 (4th ed. 2002)). Nevertheless, this does not render Mexico's opinion of no value. Rather, as Mexico and the United States are both parties to the Harmonized Tariff Schedule, opinions of sister signatories are probative. See, e.g., Olympic Airways v. Husain, 540 U.S. 644, 658 (2004) (Scalia, J.

crankshafts in question were not classifiable under heading 7224, HTS, as argued by Cummins, when they entered Mexico.

Following the publication of Customs' advanced ruling letter, Cummins began to import its crankshafts into the United States. Customs assessed the crankshafts a duty rate applicable to products that did not originate in a NAFTA party.  Cummins now seeks review of that assessment.[10]

---

dissenting) ("Today's decision stands out for its failure to give any serious consideration to how the courts of our treaty partners have resolved the legal issues before us."); Air France v. Saks, 470 U.S. 392, 404 (1985) (noting that opinions of our sister signatories are entitled to considerable weight) (O'Connor, J.).  This is especially true when the United States and WCO agree with this interpretation and where, as here, the interest of promoting uniformity across nations is strong. Moreover, it is unlikely that Mexican authorities have interests adverse to the United States on this question and Cummins had every ability to challenge the classification.  An additional consideration is that the NAFTA regime should not encourage importers to exploit divergences in tariff classifications to take unfair advantage of the system.  It would not seem appropriate, for example, for an importer to gain the benefit of a lower tariff rate for its imports into Mexico under one heading, then, argue a different classification before Customs entitling it to further tariff benefits.

[10]Cummins originally requested the advance letter ruling on March 15, 2000 and September 13, 2000.  Headquarters Ruling 964019 (Dec. 13, 2000).  In response to Customs' negative determination, Cummins filed an action under 28 U.S.C. § 1581(h) (the "§ 1581(h) action").  Subsection (h) authorizes this Court to review pre-importation Customs' rulings if the party commencing the action demonstrates that "he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation."  28 U.S.C. § 1581(h).  Following Defendant's response to the § 1581(h) action, Cummins imported a test shipment of three finished crankshafts, and marked the goods as originating from Mexico.  After protesting Customs' classification of its test shipment, Cummins filed an action under § 1581(a), and the Court consolidated the two actions.

## II. Standard of Review

Both parties have moved for summary judgment pursuant to USCIT Rule 56. Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT R. 56(c). Material issues only arise concerning "facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Consequently, in classification cases, genuine issues of material fact only arise when there is a dispute over the use, characteristics, or properties of the merchandise being classified. Brother Int'l Corp. v. United States, 26 CIT 867, 869, 248 F. Supp. 2d 1224, 1226 (2002). Because the Court finds no issues of material fact in dispute, summary judgment is appropriate.

## III. Classifying the Imports

In this case the parties have identified two competing provisions under which the imports may be classified: heading 7224,

Because Plaintiff actually imported the test shipment of the finished crankshafts, the Court finds Cummins' § 1581(h) action fails to present a live controversy and is therefore moot. Accordingly, that portion of the consolidated case is dismissed. Therefore, this case concerns only the challenge to Customs' liquidation of the imported crankshafts.

HTSUS, and heading 8483, HTSUS.  Because Customs relies on GRI 2 in classifying the imports under heading 8483, HTSUS, and GRI 2 may only be applied after GRI 1 is exhausted, the Court will first address whether the imports fall under heading 7224, HTSUS. Concluding that they do not fall under heading 7224, HTSUS, the Court will next consider whether the imports are classifiable under heading 8483, HTSUS, finding that they are.

**A.**

The proper classification of merchandise is governed by the General Rules of Interpretation ("GRIs") to the HTSUS. See Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998); but see Bauer Nike Hockey USA v. United States, 393 F.3d 1246, 1252 (Fed. Cir. 2004).  GRI 1, HTSUS, provides that, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes."  In construing the terms of headings and notes, although tariff provisions employ the language of commerce, courts have long held that presumptively a term's commercial meaning is the same as its common meaning. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999).  Accordingly, the Court will construe the terms of both headings by reference to their common meanings. See Novosteel SA v. United States, 25 CIT 2, 11, 128 F. Supp. 2d 720, 728 (2001) (construing the terms in question according to their

common meaning), <u>Winter-Wolff, Inc. v. United States</u>, 22 CIT 70, 75, 996 F. Supp. 1258, 1265 (1998) (construing similar terms according to their common meaning).  In determining a term's common meaning, the Court may look to dictionaries, lexiographic and scientific authorities, as well as the Court's own understanding of the term.  <u>Carl Zeiss</u>, 195 F.3d at 1379.

**1.**

The Court first turns to the language of heading 7224, HTSUS. Heading 7224, HTSUS, covers "semifinished products of other alloy steel."  The HTSUS defines "semifinished products" as "products of solid section, which have not been further worked than . . . roughly shaped by forging, including blanks for angles, shapes or sections."  Chapter 72, Note 1 (ij), HTSUS.  From the terms of this language, in order to be a semifinished product, a product must be: (1) less than roughly shaped by forging, or (2) if roughly shaped by forging, not further worked; and/or[11] (3) a "blank[] for angles, shapes, or sections."

The imports here meet the definition of a "blank."  <u>See</u> <u>Cummins I</u>, 23 CIT at 1023-4, 83 F. Supp. 2d at 1371; Pl.'s Mem. at 11.  Therefore, the language "including blanks for angles, shapes, and sections" directly implicates the imports.  That these terms

_____

[11]The Court addresses the relationship between these clauses below.  <u>See</u> <u>infra</u> at 14-24.

of the heading do not embrace every type of blank, but only a
subset thereof, is evidenced by the words "angles, shapes, or
sections."  These words restrict the "including" language to only
a class of blanks.  Cf. Mertens v. Hewitt Associates, 508 U.S. 248,
258 (1993) ("We will not read the statute to render the modifier
superfluous.").    Both parties agree that the HTSUS defines
"angles, shapes, and sections" as "products having a uniform cross
section along their whole length which do not conform to any of the
definitions . . . above, or the definition of wire."  Note 1(n) to
Chapter 72, HTSUS.   The imports do not have a uniform cross
section, nor will the finished product, and therefore, as conceded
by Cummins, do not meet this description.  Consequently, while the
imports are blanks, they are not blanks for angles, shapes, or
sections.[12]

    As previously noted, heading 7224, HTSUS, covers "products of

_____

        [12]The WCO did not define this requirement in precisely the
same manner but arrived at the same conclusion.  Instead, the WCO
found this language only incorporated "blanks which [did not]
have the approximate shape or outline of the finished article,
i.e., [were not] unfinished articles having the essential
character of finished articles."  Certain Forgings, Doc. NC0317E1
at para. 27; cf. John V. Carr & Son, Inc. v. United States, 72
Cust. Ct. 19, 26 (1974).  Cummins' imports, however, do not fit
this description.  The crankshafts are "forgings [that] have the
general shape of crankshafts and are intended solely for use as
crankshafts."  See Agreed Stmt. Facts at para. 53.  Therefore,
under the WCO's legal analysis, the crankshafts do not fall under
heading 7224, HTSUS.  The Court notes that Note 1(n) to Chapter
72, HTSUS, defines the term "angles, shapes, and sections"
whereas Note 1(ij) uses the term "angles, shapes, or sections."
However, given that the common meaning and HTSUS meaning arrive
at the same conclusion, the Court need not dwell on this issue.

solid section, which have not been further worked than . . .
roughly shaped by forging, <u>including</u> blanks for angles, shapes or
sections." (Emphasis added).  As courts have long recognized, the
meaning of the term "including" varies with context.  <u>The Newman</u>
<u>Co. v. United States</u>, 57 Cust. Ct. 117, 124 (1966); <u>see also</u>
<u>Montello Salt Co. v. State of Utah</u>, 221 U.S. 452, 465 (1911).  A
statute's use of the term "including" generally may serve: (1) not
to provide an "all-embracing definition, but [to] connote[] simply
an illustrative application of the general" description without
limiting the general description;[13]  (2) to add products to the
heading that fall outside the general description;[14] (3) to arrest
any doubt as to whether the exemplars are included within the
class;[15] or (4) to demarcate the boundary between what falls within

---

[13]<u>Fed. Land Bank of St. Paul v. Bismarck Lumber Co.</u>, 314
U.S. 95, 100 (1941), <u>see also</u> <u>Phelps Dodge Corp. v. NLRB</u>, 313
U.S. 177, 189 (1941) ("To attribute such a function to the
participial phrase introduced by 'including' is to shrivel a
versatile principle to an illustrative application. We find no
justification whatever for attributing to Congress such a
casuistic withdrawal of the authority which, but for the
illustration, it clearly has given the Board. The word
'including' does not lend itself to such destructive
significance.").  Even if the Court were to use this meaning of
"including," such a reading would still cast doubt upon Cummins'
argument as blanks with the character of articles of other
headings are quite different than blanks for angles, shapes, or
sections.  <u>See</u> <u>infra</u> at 19-21(discussing this distinction).

[14]<u>United States v. Pierce</u>, 147 F. 199, 201 (2nd Cir. 1906)
(interpreting a tariff provision); <u>The Newman Co. v. United</u>
<u>States</u>, 57 Cust. Ct. 117, 125 (1966).

[15]<u>Young v. United States</u>, 315 U.S. 257, 261 (1942), <u>Faus</u>
<u>Group v. United Sates</u>, 28 CIT ___, ___, 358 F. Supp. 2d 1244,
1252 n. 14 (2004).

the general class from that which falls without thereby limiting the scope of the general class.[16]

In deciding which of these possibilities apply, the Court must read the "including" language in the light of the context and purpose of its use, see, e.g., Abbott Lab. v. CVS Pharmacy, Inc., 290 F.3d 854, 860 (7th Cir. 2002); Adams v. Dole, 927 F.2d 771, 776-77 (4th Cir. 1991), or as the legislative history may suggest, Hiller v. United States, 106 F. 73, 74 (2nd Cir. 1901) (interpreting a tariff provision). There are four reasons, in this case, why the "including" language is best read as demarcating a boundary line thereby excluding blanks with the character of finished products.

First, the most natural reading of the definition is that the term "including" plays the part of defining the boundary of the general class (thereby establishing the limits of what falls within the class with respect to "blanks"). Cf. Bausch & Lomb v. United States, 148 F.3d 1363, 1367 (Fed. Cir. 1998) (invoking the canon of expressio unius est exclusio alterius to hold that what was not

_____

[16]Montello Salt Co. v. State of Utah, 221 U.S. 452, 465 (1911), Abbott Lab. v. CVS Pharmacy, Inc., 290 F.3d 854, 860 (7th Cir. 2002); Bausch & Lomb v. United States, 148 F.3d 1363, 1367 (Fed. Cir. 1998), Adams v. Dole, 927 F.2d 771, 776-77 (4th Cir. 1991); Cashman v. Dolce Int'l/Hartford, Inc., 225 F.R.D. 73, 84 (D. Conn. 2004) ("the word 'including' need not always be used by Congress in an illustrative manner. The term can also be used and construed as restrictive and definitional."). The Court acknowledges that these categories are far from precise and that there may be extensive overlap between the categories.

included within "including" language was excluded).  The "including" clause itself sets forth a class of objects, i.e., "blanks."  That the general class of blanks was qualified by the terms "angles, shapes or sections" signifies that the entire class of blanks was not included, but only certain types of blanks.  Cf. Harmonized Commodity Description and Coding System Explanatory Note to Heading 72.16, at 1240 (3rd ed. 2002) ("Explanatory Notes") (limiting the coverage of the term "angles, shapes, and sections" to products that do not assume the character of articles of other headings).  The inclusion of a class of products (i.e., blanks), but only a subset of that class (i.e., for angles, shapes, or sections),  suggests that those elements not included within that class and are excluded.

More importantly, however, is the fact that the term "blank" is a term of art.[17]  Pursuant to GRI 2, "blanks" are classifiable under the headings of the finished product of which they bear the character unless otherwise directed by GRI 1.  That blanks are classifiable under the headings of finished products, unless otherwise directed by the GRI 1, explains the import of the "including" language.  Specifically, the "including" language establishes a rational dividing line between those blanks covered

_____

[17]See Explanatory Notes to Rule 2(a) at 2 ("The term "blank" means an article, not ready for direct use, having the approximate shape or outline of the finished article . . . , and which can only be used, other than in exceptional cases, for completion into the finished article.").

under heading 7224, HTSUS, from those blanks classifiable under other headings by virtue of GRI 2. That the drafters acknowledged the default rule (with the "including blanks for angles, shapes, or sections" clause), indicates that the drafters were conscientious of this default rule when specifying the scope of heading 7224, HTSUS. Without such instruction (when considered in light of the imprecision of the other terms of the heading) classifying blanks becomes difficult; with such instruction, classifying blanks becomes more precise and logical. This explains the drafters decision to employ the "including" language. The fact that the drafters recognized the problem of the scope of heading 7224, HTSUS, and purposefully did not include certain types of blanks, indicates that the drafters intended to distinguish the types of blanks covered under that heading. Consequently, the reasonable interpretation of this language is that blanks that are not "angles, shapes, or sections" are excluded from heading 7224, HTSUS.

Moreover, this reading is also consistent with the terms "roughly shaped by forging." The Explanatory Notes specify that roughly shaped forgings require "considerable further shaping." See Explanatory Note to Heading 72.07 at 1228. Although this description lacks a degree of precision, what is clear, is that not all types of forgings are included within the terms used in Chapter 72, Note 1(ij), but only roughly shaped forgings. Given this lack

of precision, the use of the a participle such as "including," is best read as defining and clarifying the preceding terms. Cf. Montello Salt Co. v. Utah, 221 U.S. 452, 465 (1911) ("'Including' being a participle is in the nature of an adjective and is a modifier."). This is especially true given that the term "blank" is defined in terms of the advancement in the shape of the article in question, i.e., blanks "hav[e] the approximate shape or outline of the finished article." Accordingly, when the terms "roughly shaped by forging" are read in conjunction with the "including" language, it is apparent that the drafters meant to limit heading 7224, HTSUS, to only a certain type of blanks.

Second, this reading is reinforced by the purpose of heading 7224, HTSUS. Cf. Dole Food Co. v. Patrickson, 538 U.S. 468, 484 (2003) (Breyer, J. concurring in part and dissenting in part) ("Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purposes."). Heading 7224, HTSUS, covers products that have been advanced beyond a natural state (i.e., raw materials) but insufficiently advanced to be classified under a heading covering finished products. In contrast, GRI 2 calls for the classification of blanks under the heading of the finished products of which they assume the character. That the HTSUS provides for the classification of some blanks under heading 7224, HTSUS, is partly necessitated by the fact that alloy steel, at an

intermediate stage of manufacture, cannot be classified under the heading of a finished product because it still can be converted into many different final products -- it is this potential that renders it inapt to classify some semifinished products under the headings of finished products.  However, where, as in this case, a product is so sufficiently advanced that it has the recognizable shape of a finished product, and can only be converted into a single product, it can easily be classified under the heading of a finished product.  This reading is bolstered by the Explanatory Notes which direct that semifinished products of other alloy steel under heading 7224, HTSUS, "may be worked provided that they do not thereby assume the character of articles or of products falling in other headings."  See Explanatory Note to Chap. 72, Sub-chapter IV at 1245 (emphasis in original); cf. Note 1(f) to Section XV, HTSUS (instructing that crankshafts are not classifiable under such headings as heading 7224, HTSUS).  The Explanatory Notes have particular relevance here as heading 7224, HTSUS, was drafted at the international level.  Cf. Pima Western, Inc. v. United States, 20 CIT 110, 113, 915 F. Supp. 399, 402 (1996) ("Where the United States has adopted headings, subheadings, and related chapter notes verbatim from the CCC's version, the CCC's Explanatory Notes are especially helpful in interpreting the HTSUS, albeit not dispositive.").  Accordingly, the "including" language is best read as creating a rational dividing line distinguishing blanks

classified as semifinished products from blanks considered classified under the headings of finished products.

Third, a similar analysis appears to have been adopted by the Secretariat (and presumably the body) of the WCO and Customs. The WCO found that by "[a]pplication of [GRI] 2(a) and Note 1(f) to Section XV," "closed-die crank shaft forgings (sometimes described as blanks)" are considered unfinished crankshafts classifiable under 8483.10, HTSUS. <u>Amendments to the Compendium of Classification Opinions Arising from the Classification of Certain Forgings for Crank Shafts in Subheading 8483.10</u>, Doc. NC0379E1 at 3 (March 8, 2001). For the United States to defect from the international norm would frustrate the objectives of a harmonized tariff system. <u>See</u> 19 U.S.C. 3005(a)(2). This, in turn, would create uncertainty in international trade and commerce which the WCO was created to avoid.[18] Furthermore, it is unlikely that Congress would have established procedures for seeking guidance from the WCO, <u>see</u> 19 U.S.C. §§ 3010(b)(2)(C) & 3010(c), only to

---

[18]Cummins argues that the facts presented to the WCO were misleading and therefore contaminated its analysis. Notwithstanding the fact that the WCO may not have had the full facts that are before the Court, this in no way undermines its legal analysis. Moreover, the facts presented were not sufficiently different to render its legal analysis inapt.

Cummins further contends that the WCO did not consider the significant further working of the product in Mexico, but only considered that which had been done to the product in Brazil. However, the plain language belies Cummins' claim, i.e., "further worked . . . than roughly shaped by forging." This language focuses on what has been done to the product, not what will be done to the product.

have the Court entirely ignore this guidance.[19]  This is especially

true when the WCO has (essentially) adopted the United States'

interpretation of the provision.  Cf. Fed. Mogul Corp. v. United

States, 63 F.3d 1572, 1582 (Fed. Cir. 1995) (noting that deference

for agency interpretations is highest when the action is a result

of compliance with international obligations), see also Crosby v.

Nat'l Foreign Trade Council, 530 U.S. 363, 381-82 (2000)

(recognizing the importance of speaking with one voice to the

international community in trade matters), Baker v. Carr, 369 U.S.

186, 217 (1962) (noting that judicial restraint is implicated in

avoiding the embarrassment of multifarious pronouncements on

questions of international concern).  Additionally, as the chief

architect of the HTS(US), the WCO's objective interpretations of

the language it devised should be given respect.  Cf. Auer v.

Robbins, 519 U.S. 452, 461-63 (1997) (noting that objective

interpretations by the drafters of regulations are entitled to

---

[19]Cf. H.R. Conf. Rep. No. 100-576, at 549 (1988) ("Although generally indicative of proper interpretation of the various provisions of the Convention, the Explanatory Notes, like other similar publications of the Council, are not legally binding on contracting parties to the Convention.  Thus, while they should be consulted for guidance, the Explanatory Notes should not be treated as dispositive.") (emphasis added).  Nor is it reasonable to assume that such opinions would only have effect on administrative agencies, but not on the courts.  See United States v. Haggar Apparel Co., 526 U.S. 380, 388 (1999) ("We shall not assume that Congress was concerned only to ensure that customs officials at the various ports of entry make uniform decisions but that it had no concern for uniformity once the goods entered the country and judicial proceedings commenced.").

great weight so long as such interpretations are not clearly
erroneous); <u>Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util.
Dist.</u>, 467 U.S. 380, 390 (1984) ("principles of deference have
particular force in [the] context of this case.  The subject under
[consideration] is technical and complex.  [The agency] has
longstanding expertise in the area, and was intimately involved in
the drafting and consideration of the statute by Congress.").

Last, such an approach creates a workable and predictable
standard and is supported by the history of this provision.  As the
WCO Secretariat recounted:

> [O]ne interpretation for the reference to blanks in Note
> 1 (ij) to Chapter 72 would be that it applies to all
> blanks, even those which are recognizable as final
> articles, if they have not been further worked.  In Doc.
> 24.240, the [Commission of the European Communities
> ("CEC")] proposed a definition for semi-finished
> products, which included the phrase "blanks for angles,
> for shapes and for sections".  Paragraph 43 of that
> document reads "it was understood that the CEC proposal
> regarding blanks is based on the fact that the blanks
> concerned [e.g., blanks for angles, shapes or sections]
> are products of industry sectors different from those
> which produce finished articles.  On the other hand the
> classification of all recognizable blanks with the
> corresponding finished articles, as suggested by the
> Japanese Administration, would probably simplify the
> application of the Nomenclature in this respect.["] . .
> . As the phrase "blanks for angles, shapes or sections"
> is contained in the present Note 1 (ij), the Secretariat
> understands that the Committee agreed with the CEC's view
> over the Japanese view. . . . The specific inclusion in
> this Note of blanks for angles, shapes or sections
> operated as a limited exception to the rule that
> unfinished or incomplete goods, having the essential
> character of the finished good, are classified in the
> same heading as the good.

<u>Certain Forgings</u>, Doc. NC0317E1 at paras. 26-27.  As this passage

reveals, the Court's interpretation is substantiated by the history of heading 7224, HTSUS, and concern of the drafters to create a workable and predictable standard and a nomenclature that appropriately represented commercial practices.

Cummins objects to this analysis on multiple grounds: (1) that this reading turns the term "including" into a word of exclusion; (2) that the language is necessary to include blanks for angles, shapes or sections; and (3) that this construction would require reading "the terms of the chapter note out of order, and resort[] to GRI 2(a) to reach the question of whether an article is a blank." The Court will address each objection in turn.

First, Cummins claims that the Court's reading undermines the general definition of "semifinished products" because Cummins' crankshafts fall within the general definition of "semifinished products." Pl.'s Resp. Ct.'s Quest. at 6, 9; but see infra at 28-32 (discussing why the crankshafts do not fall within the language of the preceding terms). This argument is similar to the argument advanced by the plaintiff, and rejected by the court, in Bausch & Lomb v. United States, 148 F.3d 1363, 1366-67 (Fed. Cir. 1998). In Bausch & Lomb, the plaintiff argued that its battery-operated electric toothbrushes fell under heading 9603, HTSUS, covering "[b]rooms, brushes (including brushes constituting parts of machines, appliances or vehicles)." Although the court agreed that plaintiff's imports fell under the term "brushes," it held

that the subsequent "including" clause, i.e., "including brushes constituting parts of machines, appliances or vehicles," limited the scope of the heading to only products meeting the description of that clause. Bausch & Lomb, 148 F.3d at 1367.[20] Similarly, even if Cummins were correct in arguing that its imports fell within the general description of the heading, the "including" language may, and in this case does, indicate that the imports do not fall under heading 7224, HTSUS.

Next Cummins argues that:

> [S]emifinished products are, in part, "continuous cast products of solid section" and include[] "other products of solid section ...[.]" Angles, shapes, and sections are defined as products "having a uniform solid cross section." Thus, the definitions are subtly different, in that semifinished products need not have a uniform cross section. Consequently, blanks for angles, shapes, and sections do not appear to be included in the definition of semifinished products. . . . Given the ubiquity of angles, shapes, and sections in Chapter 72, it is entirely reasonable to believe that the tariff language would clarify the treatment of blanks for these articles.

---

[20]The court in Baush & Lomb confirmed this reading by noting that the "including" language was meant to further define the preceding language to avoid the previous language becoming over broad, and, therefore, usurping other headings. Bausch & Lomb, 148 F.3d at 1367. Here, a similar problem exists in that the HTSUS classifies blanks under the heading of the finished products they resemble. The "including" language appropriately distinguishes blanks that are considered semifinished products from blanks considered finished products, thereby preventing heading 7224, HTSUS, from being read to cover products intended to be classified elsewhere.

Pl.'s Resp. Ct.'s Quest. at 7-8.  Considered closely,[21] it is evident that Cummins' argument actually refutes, rather than supports, its position.  Because the definition of "semifinished products" is sufficiently broad to include "blanks for angles, shapes, or sections" it becomes important to determine why the drafters felt the "including" clause was necessary.  The most reasonable explanation is that the drafters wanted to demarcate those types of blanks included under the heading from the blanks that were not so included.  This is especially true given that the ubiquity of blanks resembling finished products is more problematic than blanks for angles, shapes and sections, and therefore, require specific direction in their classification under heading 7224, HTSUS.

Third, Cummins challenges the propriety of this reading arguing that this logic holds:

_____

[21]The definitions of "semifinished products" and "angles, shapes, and sections" are the same except that the definition of "angles, shapes and sections" requires an additional element, i.e., that the products have a uniform cross-section.  Cf. Note 1 (ij) to Chapter 72, HTSUS, "Semifinished products[:] Continuous cast products of solid section . . ." with Note 1 (n) to Chapter 72 ("Angles, shapes and sections[:] Products having a uniform solid cross section . . .").  Therefore, blanks for angles, shapes, and sections are a subset of "semifinished products" and fall clearly within the definition of "semifinished products." As a matter of logic, all blanks for angles, shapes and sections are semifinished products, but not all semifinished products are blanks for angles, shapes, or sections.
  Because blanks resembling finished products are more complex, it would be much more likely that they would fall outside this language.  Therefore, the failure to include them under the heading is a clear indication of their exclusion.

> [T]hat articles that are blanks but are not for angles, shapes, or sections are <u>excluded</u> from heading 7224, HTSUS without regard to whether they are roughly shaped by forging, or further worked.  This interpretation necessitates reading the terms of the chapter note out of order, and resorting to GRI 2(a) to reach the question of whether an article is a blank before determining whether it otherwise meets the definition of semifinished products.

Pl.'s Resp. Ct.'s Quest. at 9 (emphasis in original).  This argument is unsound.  First, it is the language of the heading itself that requires defining the term "blank."  To suggest that because GRI 2 incorporates the notion of the "blank," a court is to ignore the language of the heading or chapter note, betrays the command of GRI 1.  GRI 1, HTSUS ("for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes.").  Cummins' failure to offer an alternative definition suggests that Cummins wants to read this word out of the heading, which, of course, the Court may not do.  Moreover, it does make sense, for purposes of the GRI 1 analysis of heading 7224, HTSUS,  to define "blanks" as used in the heading in a similar manner to GRI 2.  Because the HTSUS has a method for classifying blanks which resemble finished products these products are classifiable elsewhere.  Consequently, as stated above, this creates a rational dividing line between types of blanks.  Second, that a court is not allowed to gather meaning from all the words in the heading is legally incorrect.  Statutes are read holistically and so that no part of the statute

is rendered superfluous.  See Hibbs v. Winn, 124 S.Ct. 2276, 2285-86 (2004).  This may require that terms appearing later in a sentence inform the meaning of terms appearing earlier in that sentence.  Cf. Bausch & Lomb, 148 F.3d at 1367 (employing a very similar approach to the one employed here.).  This is especially true where the meaning of other terms of the heading are in dispute and do not admit an easy answer.  See Cummins I, 23 CIT 1019, 1026-27, 83 F. Supp. 2d 1366, 1373-74 (1999) (setting forth the analysis of construing heading 7224, HTSUS); cf. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307 (1961) ("The maxim noscitur a sociis . . . is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.").

*                    *                    *

Accordingly, because the imports are blanks, but not blanks for angles, shapes, or sections, they are not classifiable under heading 7224, HTSUS.

**2.**

Even if the "including" language does not per se exclude Cummins' imports from heading 7224, HTSUS, other aspects of the heading's plain language do.  Heading 7224, HTSUS, covers "products of solid section, which have not been further worked than . . .

roughly shaped by forging, including blanks for angles, shapes or sections." Even assuming that the imports are only "roughly shaped" by forging, Cummins' imports have been "further worked" and, therefore, are not classifiable under heading 7224, HTSUS.

In Cummins I, the Court defined the term "further worked" using its common meaning, which is: "to form, fashion, or shape an existing product to a greater extent." Cummins I, 23 CIT at 1024, 83 F. Supp. 2d at 1371 (citing Winter-Wolff, Inc. v. United States, 22 CIT 70, 75, 996 F. Supp. 1258, 1265 (1998)). In this case, the imports are "formed" and "shaped" after forging while still in Brazil.

As the parties have agreed, the imports are "trimmed" in Brazil after forging. Agreed Stmt. Facts at para. 2. Furthermore, the parties have agreed that "'[t]rimming' removes flash – the excess material that comes out of dies in the forging process," id. at para. 3, is "accomplished through cutting hot, malleable flash with a die," id. at para. 4, and that "[b]efore the article in question enters the trimming machine, it is in one shape. As a result of trimming[,] the flash [] comes out of the trimming machine a different shape," id. at para. 5. This description clearly demonstrates that the crankshafts are "formed" and "shaped" after forging. To wit, the products are "further worked" after forging and literally meet the definition of "further worked."

Likewise, the parties agree that the articles are coined after

forging in Brazil.  Coining does not occur in the forging press, but in a separate machine, id. at para.  24, and involves stamping the article to straighten it, id. at para. 27.  Thus, coining likewise unarguably "forms" and "shapes" the crankshafts after forging and meets the definition of "further worked."[22]

Notwithstanding the fact that trimming and coining occur "after forging," and meet the definition of "further worked," Cummins argues that these processes are necessary to make the forgings commercially viable products and, therefore, "the term 'forging' in the tariff, when taken in its commercial sense, does not contemplate an untrimmed [and uncoined] forging."  Pl.'s B. to Pl.'s Mot. & Mem. Supp. Sum. J. at 5.  In other words, Cummins raises the specter of a "commercial meaning" of "forging" in which trimming and coining are included within the umbrella (or penumbra)

---

[22]The Court further notes that coining results in "closer tolerances than can be economically produced in the forging die," Forging Industry Association, The Forging Handbook 155 (1985), and occurs in a separate machine than the forge, id.; see also Agreed Statement of Mat. Facts at para. 23.  In contrast, semifinished products are "of rough appearance and large dimensional tolerances, produced from blocks or ingots by action of power hammers or forging presses."  Explanatory Notes at 1228. This process (as well as trimming) not only necessitates actions not related to power hammers or forging presses, but also produce "closer tolerances" (contrary to the large tolerances epitomizing semifinished goods).  Therefore, these processes cannot be considered incidental to "roughly shap[ing] by forging" alloy steel, but separate operations which implicate more precisely forged products, i.e., products that do not require considerable further shaping.

of the term "forging."[23]  The failure of Cummins to adequately plead

the existence of a commercial designation[24] is not necessarily fatal

as the Court is charged with the independent responsibility of

determining the correct classification of the merchandise at issue.

See Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir.

1984) (holding that the Court should divine the proper

classification of the subject merchandise even if the proper

classification has not been raised by the parties); see also Boen

Hardwood Flooring, Inc. v. United States, 357 F.3d 1262, 1265 (Fed.

Cir. 2004) (finding a commercial meaning although none was

introduced to the trial court).  What is fatal is that even if

Cummins were correct, this fact would not help it.  Cummins'

evidence does not suggest that its definition of "forging" is

universal, but only applies for the crankshafts at issue.  However,

heading 7224, HTSUS, is general provision covering a multitude of

different products.   The Court will not ascribe a different

meaning to the same provision depending on the type of product.

Cummins' reading would require the Court to create an exception for

---

[23]According to the Forging Handbook, trimming occurs after forging.  See American Society for Metals, Forging Handbook 153 (1985) ("Upon completion of the forging operation, flash may be removed from a forging . . . .").

[24]Cummins has not offered testimony of wholesalers in the United States; rather, it is only alleged that its supplier, Krupp, has adopted this definition of "forging."  This is inadequate to prove a commercial meaning.  Cf. Witex, U.S.A., Inc. v. United States, 28 CIT ___, ____, 353 F. Supp. 2d 1310, 1317, 1322 (2004).

its product.  However, where the language does not mandate an exception, none will be permitted.  That Cummins' requires an exception from the general meaning of this phrase for its imports is clear evidence that its imports do not fall under heading 7224, HTSUS.  Moreover, Cummins has failed to allege that these "products" would be considered roughly shaped forgings in the commercial market.

**3.**

Finding that (a) Cummins' imports are blanks not included within heading 7224, HTSUS, (b) the imports have been further worked than roughly shaped by forging, and (c) the almost unanimous consensus among reviewing authorities (including the architects of the HTS) that the imports are not included under heading 7224, HTSUS, the Court finds that the imports are not classifiable under heading 7224, HTSUS.

**B.**

Next the Court considers whether the imports are classifiable under subheading 8483.10.30, HTSUS.  Subheading 8483.10.30, HTSUS, covers "transmission shafts (including camshafts and crankshafts) and cranks."  Customs relies on GRI 2(a), HTSUS, in arguing that the goods were classifiable under subheading 8483.10.30, HTSUS, upon entering Mexico.  See Def.'s Mem. Supp. Cross-Mot. Summ. J. &

Opp'n Pl.'s Mot. Summ. J. at 11, 26 ("Def.'s Mem.") at 25-26.  That rule states, "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."  GRI 2(a), HTSUS.

Specifically, Customs contends the goods had the essential character of crankshafts upon entering Mexico "as it is uncontested that [they were] the actual bod[ies] of the crankshaft[s], [were] intended for use only as crankshafts, [had] the general shape[s] of the imported crankshafts, and nothing [was] added in Mexico to the [goods] to make them finished crankshafts."  Def.'s Mem. at 26.

The Explanatory Note to GRI 2(a), HTSUS, states,

> The provisions of [GRI 2(a), HTSUS,] also apply to <u>blanks</u> unless these are specified in a particular heading.  The term "<u>blank</u>" means an article, not ready for direct use, having the approximate shape or outline of the finished article . . . , and which can only be used, other than in exceptional cases, for completion into the finished article.

Explanatory Notes at 2 (emphasis in original).  Here, there is no dispute that the goods upon importation into Mexico had the general shape of crankshafts and were intended for use solely as crankshafts.  Agreed Stmt. Facts at para. 53.  Because Plaintiff concedes that the goods were at least blanks upon entry into Mexico under the Explanatory Note to GRI 2(a), HTSUS, and has not shown that the goods were provided for elsewhere in the HTSUS as blanks,

Customs correctly determined that they were already classifiable under subheading 8483.10.30, HTSUS, as unfinished crankshafts upon entering Mexico.[25]

## C. Conclusion

Because the goods were already classifiable under subheading 8483.10.30, HTSUS, upon entering Mexico, Customs properly determined that the goods did not undergo a change in tariff classification to that heading in Mexico within the meaning of General Note 12(t)/84.243(A), HTSUS. Thus, the goods did not qualify as goods originating in the territory of a NAFTA party. The Court therefore grants Customs' motion for summary judgment on this issue.

                                        _____/s/_____
                                        Donald C. Pogue
                                        Judge

Dated: May 17, 2005
      New York, New York

---

[25]Additionally, Cummins challenges Customs' determination that the imports cannot be labeled as originating in Mexico for labeling purposes. See Pl.'s Mem. at 16; 19 U.S.C. § 1304. Because the Court finds that the imports did not originate in Mexico, the imports cannot claim Mexico as their country of origin for marking purposes.